## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| MICHAEL J. PALMIERI, | BK No. 21-09761 |
| Debtor, | Hon. Janet S. Baer |
| RICHARD FOGEL, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MICHAEL J. PALMIERI, | |
| Plaintiff, | |
| | Adv. No. _____ |
| v. | Hon. Janet S. Baer |
| SPECIALTY INDUSTRIES II, LLC, KAREN WITT and NICHOLAS R. RECCHIA, in his capacity as trustee of The Byron Street Land Trust, | |
| Defendant. | |

## COMPLAINT

Richard Fogel ("Trustee"), not personally but solely in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Michael J. Palmieri ("Debtor"), states as follows for his complaint against Specialty Industries II, LLC ("Specialty Industries II"), Karen Witt ("Witt") and Nicholas R. Recchia ("Recchia"), in his capacity as trustee of The Byron Street Land Trust ("Byron Trust").

### I.      Introduction

1.      This adversary proceeding is brought by the Trustee against the Defendants for their role in the fraudulent diversion of the real estate located at 6021 Byron St. in Rosemont, Illinois, PIN numbers 12-04-218-024 and 12-04-218-025 ("Byron Property"), from the Debtor's estate. The Trustee seeks to avoid transactions that removed the Byron Property from the Debtor's estate.

1

2.     Beginning at least in 2003, the Debtor engaged in a tax fraud scheme in which he significantly underreported the taxable wages of employees of his company to the IRS. He also underreported his own taxable income on his personal returns. To avoid his mounting debts to the IRS, the Debtor in 2005 transferred the Byron Property to Series Rosemont (defined below), a series established under a Delaware series LLC. As shown below, Series Rosemont had no separate corporate existence and was the Debtor's alter ego.

3.     To frustrate both the IRS and a law firm he had retained (which has filed a claim in the Debtor's bankruptcy), in 2014, the Debtor caused Series Rosemont to convey the Byron Property to Specialty Industries II, an LLC at that time 100% owned by Witt, the Debtor's girlfriend. In 2015, just as another creditor was pursuing the Debtor, Specialty Industries II conveyed the Byron Property to Witt outright. In 2019, just as the IRS was renewing its investigation into the Debtor's assets, Witt conveyed the Byron Property to the Byron Trust, of which she is the sole beneficiary.

4.     In this avoidance action, the Trustee asks the Court to set aside the 2014, 2015, and 2019 transactions. The Trustee brings this case within the 10-year statute of limitations available to the IRS, which has filed a claim in the Debtor's chapter 7 case. Because Series Rosemont was the Debtor's alter ego, the Bryon Property remained part of the Debtor's estate as of 2014. Specialty Industries II is liable as a recipient of a fraudulent transfer and Witt and the Byron Trust are liable as subsequent transferees under Illinois' enactment of the UFTA.

## II.     Parties and other relevant persons and entities

5.     The Debtor is a resident of the Northern District of Illinois. He filed a chapter 7 case on August 19, 2021.

6.     Joseph Macchitelli is one of the Debtor's closest friends. On information and belief, he is a resident of Illinois. At all relevant times, Macchitelli was the executor of the Debtor's probate estate in the Debtor's will.

7.      Specialty Industries, LLC ("Specialty Industries") is a Delaware series LLC. Specialty Industries is 90% owned by the Debtor in his capacity as Trustee of the Michael Palmieri Revocable Living Trust dated September 14, 2005 ("Revocable Trust") and 10% owned by Specialty Industries II, a Colorado LLC.

8.      The Revocable Trust is the sole beneficiary of the Debtor's will. The only beneficiary of the Revocable Trust during the Debtor's lifetime is the Debtor.

9.      Specialty Industries II is a Colorado LLC. At the time of the transfer attacked in this complaint, Specialty Industries II was 100% owned by Witt.

10.     On information and belief, Witt is a resident of Illinois and is the sole beneficiary and beneficial owner of assets of the Byron Trust. Upon information and belief, Witt is the Debtor's girl-friend. The Revocable Trust describes Witt as the Debtor's "friend and companion" and makes her a trust beneficiary. The Debtor gifted her his "household furniture and furnishings" and 35% of the es-tate.

11.     On information and belief, the Byron Trust is an Illinois trust formed to own the Byron Property.

### III.   Jurisdiction and venue

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is being heard by the Court pursuant to 28 U.S.C. § 157(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

13.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

14.     If proceedings to avoid and recover fraudulent transfers are found to be core proceed-ings in which the Bankruptcy Court is unable to constitutionally enter final orders due to the holding in *Stern v Marshall*, 564 U.S. 462 (2011), this matter may be heard by the Bankruptcy Court under 28 U.S.C. § 157(c). *See Executive Benefits Ins. Agency, Inc. v. Arkinson (In re Bellingham Ins. Agency,*

*Inc.)*, 573 U.S. 25 (2014).

15.     The Trustee consents to the entry of a final order by this Court.

16.     Pursuant to 28 U.S.C. §§ 1408 & 1409, this district is the proper venue for this adversary proceeding.

## IV.     Facts applicable to all counts

17.     On October 14, 1997, Norma Jean Weiner quitclaimed the Byron Property to the Debtor. The quitclaim deed was recorded on July 10, 1998.

18.     The Byron Property is the Debtor's primary residence and he continues to reside at the Byron Property.

### A.   The Debtor began a tax fraud scheme starting in at least 2003.

19.     The Debtor was a 24.5% owner and chief financial officer of Nationwide Environmental, Inc. ("Nationwide"), an asbestos and lead abatement company with offices in Melrose Park and Elmhurst, Illinois.

20.     Beginning in 2003, the Debtor began filing false quarterly tax forms (Form 941) for Nationwide with the IRS. In these forms, the Debtor systematically underreported the taxable wages Nationwide paid its employees. The scheme continued to 2007. This scheme enabled Nationwide to avoid quarterly taxes on the unreported amounts.

21.     Beginning in 2004 and continuing through 2007, the Debtor also began filing false individual income tax returns significantly underreporting his own income. The Debtor would later admit in a plea agreement in his tax fraud prosecution that he underreported $1,167,000 in personal income in tax years 2003-2007, resulting in a loss to the Government of $384,461.

22.     From 2004 to 2006, the Debtor failed to pay federal taxes in the amount of $847,447.17.

23.     Defendants knew in this period he was incurring significant liabilities to the Internal Revenue Service. Interest and penalties continued to accrue on the Debtor's unpaid taxes.

4

**B. The Debtor transferred the Byron Property to his alter ego, Series Rosemont.**

24. On September 14, 2005, the Debtor formed Specialty Industries as a Delaware series LLC and purported to transfer title to the Byron Property by warranty deed to Series Rosemont, a series established within Specialty Industries. The warranty deed conveying the Byron Property from the Debtor to Series Rosemont was recorded on title to the Byron Property on May 8, 2006.

25. On September 14, 2005, Specialty Industries did not have an operating agreement, and Series Rosemont had not yet been established as a series within Specialty Industries.

26. On November 8, 2005, the Debtor (acting as trustee of the Revocable Trust) and Macchitelli formed Specialty Industries II as a Colorado LLC. Each owned 50%.

27. That same day, Specialty Industries adopted its operating agreement. The agreement identified the Debtor, as trustee of the Revocable Trust, as a 90% owner, and Special Industries II as a 10% owner. In other words, the Debtor in effect owned 95% of Specialty Industries and Macchitelli owned 5%.

28. That same day, Specialty Industries also established two series under the Delaware Limited Liability Company Act, one of which was Series Rosemont, which adopted a separate series agreement the same day.

29. Numerous facts show that the Debtor dominated and controlled Specialty Industries and Series Rosemont such that they were the Debtor's alter egos:

a. The structure of both entities gave the Debtor complete control over their affairs. The Debtor effectively owned 95% of Specialty Industries. The Series Rosemont series agreement provided that its members were the Debtor as trustee of the Revocable Trust and Specialty Properties. Under the agreement, the Debtor was the series' sole manager, that the manager had complete control over all matters except those requiring a vote of the members under the Delaware Limited Liability Company Act. The agreement further provided that the manager could

5

be changed only on a majority vote of the non-manager members. But since the only non-manager member was Specialty Industries II, and the Debtor controlled 50% of Specialty Industries II, the Debtor could not be replaced by a vote of the non-managing members without his agreement.

b.      The sole purpose for the existence of Specialty Industries and Series Rosemont was to hold title to the Byron Property to frustrate the Debtor's creditors. Indeed, the Series Rosemont series agreement provided that Series Rosemont's sole purpose was to acquire, own, and manage the Byron Property.

c.      Series Rosemont had no other business than holding title to the Byron Property. Series Rosemont has no business creditors who would be adversely affected by a finding that it is the Debtor's alter ego.

d.      The Debtor's records show that the Debtor did not conduct Specialty Industries and Series Rosemont's business in accordance with the formalities required by the Delaware Limited Liability Company Act.

e.      The Debtor never sought approval for any action from Specialty Industries II, its minority owner.

f.      Specialty Industries never made a distribution to Specialty Industries II.

g.      The Debtor's creditors played no role in the creation of Specialty Industries or Series Rosemont or the Debtor's use of those entities to perpetrate a fraud against them. The public good would be served by piercing Specialty Industries and Series Rosemont's veils so that the Debtor's creditors can access the Byron Property.

h.      No other remedies are available to the Debtor's creditors because the Debtor has no other assets.

i.      On information and belief, Series Rosemont paid no consideration for the Byron

6

Property.

j.       The Debtor made all major decisions for Specialty Industries as if its property were his own. The Debtor continued to live in the Byron Property after conveying it to Series Rosemont and did not sign a lease or pay rent to Series Rosemont.

k.       In a 2010 plea agreement in his later criminal prosecution, the Debtor agreed that he "controlled" a company known as "Specialty Industries, Inc." The only Debtor-affiliated company called "Specialty Industries" that existed when the plea agreement was signed was Specialty Industries.

### C. The Government indicted the Debtor for tax fraud and the Debtor pleaded guilty.

30.     On April 29, 2010, a federal grand jury indicted the Debtor for 21 counts of tax fraud. The criminal case was captioned *United States v. Michael J. Palmieri*, 10 CR 0348 (N.D. Ill.).

31.     In the indictment, the government alleged that from 2003 to 2007 the Debtor had underreported the quarterly taxable wages of Nationwide's employees and filed false individual income tax returns understating his own income.

32.     On October 14, 2010, the Debtor pleaded guilty to one count of the then-superseding indictment as part of a plea agreement with the government. In the plea agreement, the Debtor agreed to pay restitution of $673,031, $468,031 of which was attributed to damages imposed on the IRS, before his sentencing. The Debtor also acknowledged in his plea agreement that his plea-bargain or payment of restitution *did not limit the IRS from collecting additional taxes, interest, or penalties*. The restitution amount did not clear the entirety of the Debtor's outstanding tax debt to the IRS.

33.     On January 13, 2011, the district court sentenced the Debtor to six months of home confinement and three years of probation, and imposed restitution in the agreed amount of $673,031.

**D. The Debtor transferred the Byron Property to Specialty Industries II, an entity by then 100% controlled by his girlfriend, just as he began receiving legal services from one of his creditors.**

34.     On January 2, 2011, eleven days before he was sentenced in his criminal prosecution, the Debtor and Macchitelli transferred 100% of their interests in Specialty Industries II to Witt, the Debtor's girlfriend.

35.     On July 10, 2014, the Debtor filed a lawsuit in the Circuit Court of Cook County, captioned *Palmieri, et al. v. Sisk, et al.*, 2014-L-7273 ("*Sisk* Lawsuit"). In the *Sisk* Lawsuit, the firm of Cohon Raizes & Regal, LLP ("CRR") represented the Debtor. On information and belief, the Debtor did not keep current on CRR's invoices.

36.     On July 21, 2014, Series Rosemont quitclaimed the Byron Property to Specialty Industries II. Specialty Industries II did not provide consideration for the transfer. The deed was recorded on August 11, 2014.

**E. Specialty Industries II transferred the Byron Property to the Debtor's girlfriend personally when a creditor was pursing him.**

37.     In late 2015, the Debtor's financial situation continued to worsen. David E. Feldman claimed that the Debtor owed him in connection with a personal loan. On December 28, 2015, David E. Feldman filed suit against the Debtor in the Circuit Court of Cook County, captioned *Feldman v. Palmieri*, No. 2015-M3-007575 ("Feldman Lawsuit"). The *Feldman* Lawsuit sought to recover for a personal loan Feldman had made to the Debtor.

38.     In the same period, on October 19, 2015, Specialty Industries II quitclaimed the Byron Property to Witt. Witt did not provide reasonably equivalent value for the Byron Property.

**F. The Debtor's girlfriend conveyed the Byron Property to a trust when the IRS investigation into the Debtor heated up again.**

39.     On information and belief, in the second half of 2019, the IRS investigation into the Debtor was continuing. In particular, the IRS was investigating whether the Debtor continued to own

the Byron Property and held it in other entities' names only to shield it from creditors.

40.     On October 22, 2019, the IRS issued a subpoena to Bank of Bourbonnais in an effort to discern whether the Debtor continued to maintain control of the Byron Property as part of its efforts to collect the Debtor's back taxes. On November 14, 2019, Witt filed an action in the United States District Court for the Northern District of Illinois seeking to quash the subpoena. The action was captioned *Witt v. Internal Revenue Service*, No. 1:2020-cv-7537, and assigned to Judge Robert Dow, Jr. On April 28, 2020, Judge Dow denied the motion. He entered judgment in favor of the IRS the next day.

41.     In this same period when the IRS was continuing to investigate the Debtor and the Byron Property, on August 30, 2019, Witt purported to convey the Byron Property by warranty deed to Nicholas R. Recchia in his capacity as trustee of the Byron Trust. The deed was recorded on title to the Byron Property on September 3, 2019.

### G.  The Debtor sought bankruptcy protection.

42.     On August 19, 2021, the Debtor filed a chapter 7 case. The Court appointed the Trustee.

43.     On November 10, 2021, the Internal Revenue Service filed a claim in the Debtor's case for $874,447,17 in unpaid taxes. The IRS is subject to a ten-year statute of limitations for collection actions. 26 U.S.C. § 6502(a)(1). Under 11 U.S.C. § 544(b), that limitations period applies to any avoidance action by the Trustee.

44.     On November 24, 2021, CRR filed a claim in the Debtor's case for $117,715.84 owed for legal services.

45.     On March 7, 2022, Feldman filed a claim in the Debtor's case for $38,000, representing the judgment in his favor in the Feldman Lawsuit.

9

**COUNT I**

**Avoidance of Actual Fraudulent Transfers Pursuant to
740 ILCS 160/5(A)(1) and 11 U.S.C. § 544
(Against all Defendants)**

46.     The Trustee repeats and realleges the allegations in paragraphs 1 to 45 as if fully set forth herein.

47.     As alleged in paragraph 29 above, Series Rosemont is an alter ego of the Debtor.

48.     On July 21, 2014, the Debtor caused his alter ego Series Rosemont to transfer the Byron Property to Specialty Industries II.

49.     In conducting the transaction, the Debtor acted with actual intent to hinder, delay, or defraud his creditors. This allegation is supported by the facts that: (1) the transfer was to an insider (a company by that time owned by Witt) (badge 1); (2) because the Debtor's girlfriend owned Specialty Industries II and the Debtor dominated Series Rosemont, the Debtor retained complete control of the Byron Property after the transfer (badge 2); (3) the Debtor had not only been threatened with suit, he was prosecuted for federal tax fraud and was aware he had outstanding and accumulating debts to the IRS and CRR (badge 4); (4) the Byron Property was the only asset Series Rosemont owned (badge 5); (5) the Debtor was clearly aware of the danger of a veil-piercing action by his creditors because he removed the Byron Property to an entity his girlfriend owned (badge 7); (6) Series Rosemont did not receive reasonably equivalent value for the Byron Property (badge 8); and (7) on information and belief, the Debtor was insolvent before the transfer (badge 9).

50.     Therefore, the 2014 transfer is an avoidable transfer within the meaning of 740 ILCS § 160/5(a)(l), is subject to avoidance by the Trustee pursuant to 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers to the extent it is avoided, pursuant to 740 ILCS § 160/5 and 11 U.S.C. § 544.

51.     Witt, Recchia, and the Byron Trust are liable as subsequent transferees under 740 ILCS

160/9 and 11 U.S.C. § 550 because they took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Byron Property. Witt was the Debtor's girlfriend, 100% owner of Specialty Industries II on the date of the transfer, and is the sole beneficiary of the Byron Trust.

WHEREFORE, the Trustee requests that the Court avoid the 2014 and subsequent transfers and enter judgment in his favor for the value of the Byron Property against Defendants, plus interest and other amounts allowable.

## COUNT II

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS § 160/5(A)(2) and 11 U.S.C. § 544
### (Against all Defendants)

52. The Trustee repeats and realleges the allegations in paragraphs 1 to 45 as if fully set forth herein.

53. As alleged in paragraph 29 above, Series Rosemont is an alter ego of the Debtor.

54. On July 21, 2014, the Debtor caused his alter ego Series Rosemont to transfer the Byron Property to Specialty Industries II.

55. Neither the Debtor nor Series Rosemont received reasonably equivalent value in exchange for the Byron Property.

56. At the time of the 2014 conveyance, the Debtor's assets were unreasonably small in comparison to his obligations.

57. At the time of the 2014 conveyance, the Debtor believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due. Over the subsequent years, the Debtor in fact was unable to pay hundreds of thousands of dollars in liability represented by claims in his chapter 7 case.

58. Therefore, the 2014 conveyance constitutes an avoidable transfer within the meaning

11

of 740 ILCS § 160/5(a)(2), is subject to avoidance by the Trustee pursuant to 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of these transfers to the extent they are avoided, pursuant to 740 ILCS § 160/5 and 11 U.S.C. § 550.

59.    Witt, Recchia, and the Byron Trust are liable as subsequent transferees under 740 ILCS 160/9 and 11 U.S.C. § 550 because they took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Byron Property. Witt was the Debtor's girlfriend, 100% owner of Specialty Industries II on the date of the transfer, and is the sole beneficiary of the Byron Trust.

WHEREFORE, the Trustee requests that the Court avoid the 2014 and subsequent transfers and enter judgment in his favor for the value of the Byron Property against Defendants, plus interest and other amounts allowable.

## COUNT III

**Avoidance of Constructive Fraudulent Transfer Pursuant to
740 ILCS § 160/6 and 11 U.S.C. § 544
(Against all Defendants)**

60.    The Trustee repeats and realleges the allegations in paragraphs 1 to 45 as if fully set forth herein.

61.    As alleged in paragraph 29 above, Series Rosemont is an alter ego of the Debtor.

62.    On July 21, 2014, the Debtor caused his alter ego Series Rosemont to transfer the Byron Property to Specialty Industries II.

63.    The 2014 transfer did not provide the Debtor or Series Rosemont with reasonably equivalent value in exchange for the Byron Property.

64.    Both the Debtor and, because it was his alter ego, Series Rosemont, were insolvent at that time of the transfer or became insolvent because of the transfer

65.    Witt, Recchia, and the Byron Trust are liable as subsequent transferees under 740 ILCS

12

160/9 and 11 U.S.C. § 550 because they took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Byron Property. Witt was the Debtor's girlfriend, 100% owner of Specialty Industries II on the date of the transfer, and is the sole beneficiary of the Byron Trust.

WHEREFORE, the Trustee requests that the Court avoid the 2014 and subsequent transfers and enter judgment in his favor for the value of the Byron Property against Defendants, plus interest and other amounts allowable.

Dated: November 2, 2022

RICHARD FOGEL, not personally but solely in his capacity as the duly-appointed chapter 7 trustee for the estate of MICHAEL J. PALMIERI

By:    _____*/s/ Jonathan M. Cyrluk*_____
       One of His Attorneys

Jonathan M. Cyrluk (ARDC No. 6210250)
Joshua S. Goldberg (ARDC No. 6277541)
Steven C. Moeller (ARDC No. 6290263)
CARPENTER LIPPS & LELAND LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
goldberg@carpenterlipps.com
moeller@carpenterlipps.com