UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 21 B 09761 |
| | ) | |
| MICHAEL J. PALMIERI, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| | ) | |
| RICHARD FOGEL, not personally but solely in his capacity as chapter 7 trustee for the estate of MICHAEL J. PALMIERI, | ) ) ) | Adversary No. 22 A 00177 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPECIALTY INDUSTRIES II, LLC, KAREN WITT, and NICHOLAS R. RECCHIA, in his capacity as trustee of The Byron Street Land Trust, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court for ruling on the motion of defendants Specialty Industries II, LLC, Karen Witt, and Nicholas R. Recchia, in his capacity as trustee of The Byron Street Land Trust (together, the "Defendants"), to dismiss the adversary complaint filed by plaintiff Richard Fogel, solely as chapter 7 trustee (the "Trustee") for the estate of Michael J. Palmieri (the "Debtor"). In his three-count adversary complaint, the Trustee seeks to avoid, as fraudulent transfers, the transactions that caused the real property located at 6021 Byron Street in Rosemont, Illinois (the "Byron Property") to be removed from the Debtor's bankruptcy estate pursuant to §§ 5(a) and 6 of the Illinois Uniform Fraudulent Transfer Act (the "UFTA"), 740

1

ILCS 160/5(a) & 6, and § 544 of the Bankruptcy Code, 11 U.S.C. § 544. The Defendants move to dismiss all three counts of the complaint as time barred. For the reasons that follow, the Defendants' motion will be denied.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O).

## FACTUAL BACKGROUND

At the outset, the Court notes that, although not designated as such, the motion to dismiss is brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure (made applicable to adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure). On a Rule 12(b)(6) motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the complaint and draws all reasonable inferences from the facts in favor of the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007); *Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir. 2003). The material facts in this matter, all of which are gleaned from the Trustee's complaint, are as follows.[1]

On October 14, 1997, the Byron Property was quitclaimed to the Debtor. (Compl. ¶ 17.) That property is the Debtor's primary residence where he continues to live. (*Id.* ¶ 18.)

Beginning in the early 2000s, the Debtor started to file erroneous tax returns with the Internal Revenue Service (the "IRS"). From 2003 through 2007, the Debtor filed quarterly tax

---

[1] Unless otherwise noted, all references to the docket ("Dkt.") are to Adversary No. 22 A 00177, and all citations to the record are to facts in the Trustee's complaint ("Compl.") in that adversary, filed on November 2, 2022, at Docket No. 1.

forms for Nationwide Environmental, Inc. ("Nationwide"), an asbestos and lead abatement company in Illinois in which he had a 24.5% ownership interest and for which he served as chief financial officer. (*Id.* ¶ 19.) In those quarterly returns, he underreported the taxable wages that the company paid its employees. (*Id.* ¶ 20.) Likewise, from 2004 through 2007, the Debtor filed individual income tax returns in which he underreported a total of $1,167,000 of his own personal income. (*Id.* ¶ 21.) From 2004 to 2006, the Debtor failed to pay federal taxes of almost $850,000. (*Id.* ¶ 22.)

Some years later, aware of his mounting tax debts to the IRS, the Debtor began to form various business entities, allegedly for the sole purpose of holding the Byron Property and hiding it from the IRS. On September 14, 2005, the Debtor established Specialty Industries, LLC ("Specialty Industries"), a Delaware series limited liability company in which he held a 90% interest in his capacity as trustee of the Michael Palmieri Revocable Trust (the "Revocable Trust").[2] (*Id.* ¶ 7.) The remaining 10% of Specialty Industries was owned by Specialty Industries II, a Colorado LLC created on November 8, 2005 by the Debtor, acting as trustee of the Revocable Trust, and Joseph Macchitelli, one of the Debtor's closest friends. (*Id.* ¶¶ 7, 6, 26.) Each owned 50% of the company. (*Id.* ¶ 26.) Also on November 8, 2005, Specialty Industries established two series under the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101 to 18-1208, one of which was Series Rosemont. (*Id.* ¶ 28.) The Debtor purportedly transferred title to the Byron Property to Series Rosemont on September 14, 2005, despite the fact that Series Rosemont did not exist until nearly two months later; the warranty deed conveying the property was recorded on title on May 8, 2006. (*Id.* ¶¶ 24–28; *see also* Dkt. 26 at 4.)

---

[2] The Revocable Trust is the sole beneficiary of the Debtor's will, and, in turn, the Debtor is the sole beneficiary of the Revocable Trust during the Debtor's lifetime. (Compl. ¶ 8.)

3

About five years later, on April 29, 2010, a federal grand jury indicted the Debtor on twenty-one counts of tax fraud. (Compl. ¶ 30.) Subsequently, the Debtor pleaded guilty to one count of the indictment as part of a plea bargain with the government in which he agreed to pay restitution of $673,031. (*Id.* ¶ 32.) He also acknowledged that neither the plea bargain nor the payment of restitution limited the IRS from collecting additional taxes, interest, or penalties. (*Id.*) On January 13, 2011, the Debtor was sentenced to six months of home confinement and three years of probation and ordered to pay the restitution to which he had agreed. (*Id.* ¶ 33.) On January 2, 2011, eleven days prior to the sentencing, the Debtor and Macchitelli transferred 100% of their interests in Specialty Industries II to Karen Witt, the Debtor's girlfriend and sole beneficiary of the assets of The Byron Street Land Trust (the "Byron Trust"), an Illinois trust created for the singular purpose of owning the Byron Property. (*Id.* ¶¶ 3, 9, 10, 11.)

Ultimately, a series of transfers of the Byron Property took place over a period of years during which the Debtor was encountering various financial challenges. On July 21, 2014, at a time when he was incurring attorney's fees in connection with a lawsuit that he had filed in state court, the Debtor caused Series Rosemont to quitclaim the Byron Property to Specialty Industries II; the latter paid no consideration for the transfer. (*Id.* ¶¶ 35, 36.) On October 19, 2015, about ten months after a creditor had filed an action against the Debtor to recover on a personal loan that he had advanced to the Debtor, Specialty Industries II quitclaimed the Byron Property to Witt; Witt did not provide reasonably equivalent value for the property. (*Id.* ¶¶ 37, 38.) Finally, on August 30, 2019, as the IRS was continuing to investigate both the Debtor and the Byron Property, Witt conveyed the property by warranty deed to Recchia in his capacity as trustee of the Byron Trust. (*Id.* ¶¶ 39–41.)

4

On August 19, 2021 (the "Petition Date"), the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code. (*Id.* ¶ 5.) Shortly thereafter, on November 10, 2021, the IRS filed a claim in the Debtor's bankruptcy case for unpaid taxes in the amount of $847,447.17. (*Id.* ¶ 43.)

About a year later, on November 2, 2022, the Trustee filed his complaint, seeking avoidance of the transfers of the Byron Property which took place in 2014 and thereafter (the "Transfers") under §§ 5(a) and 6 of the UFTA and § 544(b) of the Bankruptcy Code. Subsequently, on January 17, 2023, the Defendants filed their 12(b)(6) motion, arguing that the complaint is time barred and, therefore, must be dismissed. The motion has been fully briefed and is now ready for ruling.

**DISCUSSION**

To survive the Defendants' 12(b)(6) motion to dismiss, the Trustee's complaint must clear "two easy-to-clear hurdles." *See E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint must provide fair notice of the claim and the grounds upon which it rests so that the Defendants can prepare their defense. *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019). Second, the allegations must "plausibly suggest that the [the Trustee] has a right to relief, raising that possibility above a 'speculative level.'" *See Concentra Health Servs.*, 496 F.3d at 776 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Killingsworth,* 507 F.3d at 618 (7th Cir. 2007). Plausibility means that the allegations in the complaint permit the Court to draw the reasonable inference that the Defendants are liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Untimeliness of a claim is an affirmative defense. Fed. R. Civ. P. 8(c)(1) (made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7008); *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 707 (Bankr. N.D. Ill. 2014). "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). The statute of limitations may be raised in a motion to dismiss, however, if "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (internal quotations omitted) (describing consideration of dismissal based on the statute of limitations as an "irregular approach"). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the . . . court may determine compliance with the statute of limitation based on a more complete factual record." *Id.*

### 1. Applicable Statute of Limitations

The Defendants argue that the Trustee's complaint should be dismissed as time barred because the Transfers at issue occurred outside the statute of limitations set forth in the UFTA. According to the Defendants, a claim under the applicable provisions of the UFTA must be brought within four years after the transfer was made. Because the challenged Transfers occurred on or after July 21, 2014, the Defendants say, the Trustee's complaint is time barred and must be dismissed. The Trustee argues, in turn, that § 544(b) of the Code allows him to avail himself of the ten-year statute of limitations available to the IRS in collection actions under 26 U.S.C. § 6502(a)(1). According to the Trustee, he may, thus, avoid the fraudulent transfers of the Byron

6

Property made within ten years of the Petition Date, including the 2014 transfer to Specialty Industries II and all fraudulent transfers thereafter.

Under the UFTA, a claim brought under § 5(a) of the statute must be commenced "within 4 years after the transfer was made."[3] 740 ILCS 160/10(a) & (b).[4] In contrast, a claim brought under § 6(b) will be barred if not commenced within one year after the transfer was made. 740 ILCS 160/10(c).[5]

---

[3] Subsections (a)(1) and (2) of § 5 of the UFTA provide, in relevant part, as follows:

(a) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . :

    (1) with actual intent to hinder, delay, or defraud any creditors of the debtor; or

    (2) without receiving a reasonably equivalent value in exchange for the transfer . . . , and the debtor:

        (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a)(1) & (2).

[4] A claim under section 5(a)(1), the actual fraud provision of the UFTA, may be brought later than four years after the transfer was made if commenced "within one year after the transfer . . . was or could reasonably have been discovered by the claimant." 740 ILCS 160/10(a). Section 5(a)(2), the constructive fraud provision of the statute, requires the commencement of the claim within four years without exception. 740 ILCS 160/10(b).

[5] Section 6 of the statute provides, in pertinent part, as follows:

(a) A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . . .

(b) A transfer was made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

740 ILCS 160/6.

7

The Trustee seeks to avoid the Transfers beyond the four-year statute of limitations imposed by the UFTA pursuant to § 544(b) of the Bankruptcy Code. That statute provides that a "trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 . . . ." 11 U.S.C. § 544(b)(1). Under § 544(b)(1), "[a] trustee stands in the shoes of an actual unsecured creditor and becomes subject to the same rights and limitations that the actual unsecured creditor would be subject to outside of bankruptcy." *Kaiser*, 525 B.R. at 708 (explaining that the trustee's power under § 544(b) is derivative of that of an actual unsecured creditor under the applicable law). The provision allows a "trustee to do in a bankruptcy [case] what a creditor would have been able to do outside of bankruptcy—except the trustee will recover the property for the benefit of the estate." *In re. Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014). Accordingly, "if any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate." *In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997).

The Trustee here wants to step into the shoes of the IRS as "the triggering creditor (the so-called[] 'golden creditor')." *Kaiser* 525 B.R. at 703–04. His argument is a very straightforward one: The IRS is a creditor holding an unsecured claim allowable under § 502 in the Debtor's bankruptcy case; therefore, pursuant to § 544(b), the Trustee can now step into the shoes of the IRS to avoid the Transfers.

There is a split of authority as to whether a trustee can step into the shoes of the IRS under § 544(b) and use the ten-year limitations window available to the IRS for collection of assessed taxes. *See* 26 U.S.C. § 6502(a)(1). Although the Seventh Circuit has not addressed the

8

issue, the majority of courts has concluded, based on the unambiguous language of the statute, that § 544(b) allows a trustee to take advantage of the longer limitations period as long as the IRS is a creditor in the bankruptcy case, seeking collection of back taxes. *See, e.g., Pereira v. Omansky (In re Omansky)*, Case No. 18-13809 (LGB), Adv. Pro. No. 20-01091 (LGB), 2022 WL 4281472, at *9 (Bankr. S.D.N.Y. Sept. 15, 2022); *Williamson v. Smith (In re Smith)*, Case No. 19-40964, Adv. No. 22-07002, 2022 WL 1814415, at *6 (Bankr. D. Kan. June 2, 2022); *Bledsoe v. Flamingo Props., LLC (In re Musselwhite)*, Case No. 20-00928-5-SWH, Adv. No. 20-00142-5-SWH, 2021 WL 4342902, at *10 (Bankr. E.D.N.C. Sept. 23, 2021); *Gordon v. Webster (In re Webster)*, 629 B.R. 654, 674–75 (Bankr. N.D. Ga. 2021); *Vieira v. Gaither (In re Gaither)*, 595 B.R. 201, 207–10 (Bankr. D.S.C. 2018); *Mukamal v. Citibank N.A. (In re Kipnis)*, 555 B.R. 877, 882–83 (Bankr. S.D. Fla. 2016); *Kaiser*, 525 B.R. at 709–14.

The Defendants urge the Court to reject the decision of the majority and, instead, to hold that the Trustee is limited by the four-year statute of limitations under the UFTA. In support of their position, the Defendants rely on *Wagner v. Ultima Homes, Inc. (In re Vaughan Co. Realtors)*, 498 B.R. 297 (Bankr. D.N.M. 2013), one of the few courts reaching the opposite conclusion of the majority.

In that case, debtor Vaughan Company Realtors ("VCR") paid over half a million dollars to a construction company to build a home for its principal, without receiving any consideration for the work. *Id.* at 301. More than four years after the payments had been made, VCR filed a petition seeking relief under chapter 11. *Id.* Because the payments had been made outside New Mexico's four-year fraudulent transfer statute of limitations, the chapter 11 trustee relied on

9

§ 544(b) and a claim of almost $1 million filed by the IRS in the bankruptcy case to apply the ten-year limitations period. *Id.* at 300–04.

The *Vaughan* court held that the trustee could not use the ten-year statute of limitations applicable to the IRS. *Id.* at 305–06. Specifically, the court found that the doctrine known as *nullum tempus occurrit regi*, or "no time runs against the king," did not apply because, in enacting § 544(b), Congress did not "intend[] to vest sovereign powers in a bankruptcy trustee and thereby immunize [him] from the strictures of state law in the pursuit of [his] private interests." *Id.* at 304. The court also held that, because the IRS has unsecured claims in "a substantial portion of bankruptcy cases," permitting the trustee to step into the shoes of the IRS would, for all practical purposes, render state statutes of limitations moot. *Id.* at 305. According to the court, Congress could not have intended such policy consequences. *Id.* at 306.

The Court joins others that have criticized this analysis and finds the *Vaughan* court's reasoning both unconvincing and off the mark. First, although "[the] unsecured creditor's ability to trump the applicable state statute of limitations might derive from its sovereign immunity," the trustee's "ability to override that same limitation derives from § 544(b)." *Kaiser*, 525 B.R. at 713 (internal quotations omitted). Thus, "[t]he focus of the court in determining who is acting in a 'governmental capacity' is the unsecured creditor, not the estate representative." *Id.* (internal quotations omitted).

Second, in making its decision, the *Vaughan* court heavily relied on congressional intent and policy considerations rather than focusing on the plain language of § 544(b). In construing a statute, a court should begin with the language of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989). "[A]s long as the statutory scheme is coherent and

10

consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Id.* at 240–41. In concert with the majority of courts that have considered the issue here, the Court finds that the statutory language of § 544(b) is unambiguous and clearly allows a trustee to take advantage of the extended limitations period; the statute plainly does not limit "applicable law" to state fraudulent transfer law. *See Musselwhite*, 2021 WL 4342902, at *10; *Gaither*, 595 B.R. at 209–10; *Kipnis*, 555 B.R. at 883; *Kaiser*, 525 B.R. at 711. Because the language of the statute is clear, the Court need not consider underlying policy concerns. *See, e.g.*, *Omansky*, 2022 WL 4281472, at *9 n.5 (discussing other possible consequences of the statutory interpretation but explaining that "policy considerations are solely within the purview of Congress").

In sum, the Court agrees with the majority of courts in finding that the Trustee may step into the shoes of the IRS to avoid the Transfers. Accordingly, the Court holds that the applicable statute of limitations here is ten years from the date of assessment of the relevant taxes. Because the IRS filed its claim in the Debtor's bankruptcy case on November 10, 2021, the challenged Transfers which took place on or after July 21, 2014 fall within the ten-year statute of limitations. As such, the Defendants' motion to dismiss is denied.

## 2. The Sufficiency of the Trustee's Allegations

Although the Defendants' motion to dismiss is based solely on their assertion that the Trustee's claims are time barred, they also contest the viability of the Trustee's reverse veil-piercing theory. Specifically, while the Defendants do not dispute that the transfer of the Byron Property to Specialty Industries II on July 21, 2014 falls within the extended ten-year limitations period, they argue that the complaint must be dismissed because the Debtor did not own the

11

Byron Property on that date. Rather, the Defendants say, the Debtor had transferred his interest in the property to Series Rosemont on September 14, 2005, when that company was formed, and, thus, the transfer in July 2014 was made by non-debtor Series Rosemont.[6]

The Defendants' argument is without merit.

As the Trustee quite rightly notes, the Defendants seem to ignore the crux of the complaint. That is, the Trustee alleges in his complaint that Series Rosemont was the Debtor's alter ego and that, as such, the Byron Property never left the bankruptcy estate when it was purportedly transferred from the Debtor to Series Rosemont in 2005. The sole inquiry at this stage of the litigation is whether the Trustee has alleged sufficient facts to state a reverse veil-piercing cause of action.

When a party seeks to pierce the corporate veil, the law of the state of incorporation governs. *Paloian v. Geneva Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702 (N.D. Ill. 2012). In this matter, Specialty Industries is a Delaware series LLC, which was formed under the Delaware Limited Liability Company Act. Thus, Delaware law governs whether reverse veil-piercing is appropriate.

When considering a claim for reverse veil-piercing, Delaware courts look to the typical factors reviewed when analyzing a traditional veil-piercing claim. *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 695, 714 (Del. Ch. 2021). These "so-called 'alter ego' factors . . . include insolvency, undercapitalization, commingling of corporate and personal funds, the absence of corporate formalities, and whether the subsidiary is simply a façade for the owner."

---

[6] In their motion to dismiss, the Defendants state, in error, that the property was transferred to Specialty Industries II on July 21, 2014 from Specialty Industries rather than Series Rosemont. (Dkt. ¶ 16.)

12

*Id.* "The court should then ask whether the owner is utilizing the corporate form to perpetuate fraud or an injustice." *Id.* at 714–15.

Here, the Trustee has sufficiently alleged facts to demonstrate that the Debtor had complete control over Series Rosemont, failed to comply with corporate formalities, conveyed the Byron Property to Series Rosemont without receiving consideration of any kind, and continued to use it as his primary residence after each and every transfer. Specifically, the Trustee alleges that the "series agreement" adopted by Series Rosemont provided, among other things, that its members were the Debtor as trustee of the Revocable Trust and Specialty Properties, that the Debtor was Series Rosemont's sole manager, that the manager had complete control over all matters except those requiring a vote of Series Rosemont's members, and that the manager could be changed only on a majority vote of non-manager members. (Compl. ¶ 29(a); *see also id.* at ¶ 29(k).) The Trustee further alleges that the only non-manager member was Specialty Industries II, of which the Debtor controlled 50%. (*Id.*) Thus, the Trustee contends, the Debtor could not be replaced as manager without his consent. (*Id.*)

The Trustee also asserts that the sole purpose for the existence of both Specialty Industries and Series Rosemont was to hold title to the Byron Property, that Series Rosemont had no business creditors and no commercial purpose other than to acquire and own the property, that the Debtor did not conduct Series Rosemont's business in accordance with the formalities required by the Delaware Limited Liability Company Act, that the Debtor never sought approval for any action from its minority owner Specialty Industries II, and that Specialty Industries never made a distribution to Specialty Industries II. (*Id.* ¶¶ 29(b)–(f).)

13

The Court finds that all of these alleged facts are sufficient to state a reverse veil-piercing claim at this stage of the adversary proceeding. If the Court ultimately finds in favor of the Trustee on his claim, the inescapable conclusion will be that the Debtor owned the Byron Property when it was transferred to Specialty Industries II on July 21, 2014 and that, as such, the property was a part of the bankruptcy estate at that time.

The purpose of a motion to dismiss is to test the legal sufficiency of a claim. *Kaiser*, 525 B.R. at 706. In assessing sufficiency, the issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005) (internal quotations omitted). For the reasons discussed above, the Trustee is entitled to offer evidence in support of his claims.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is denied, and the above-captioned adversary proceeding is continued for further status to May 17, 2023, at 10:00 a.m. A separate order will be entered consistent with this Memorandum Opinion.

Dated: May 15, 2023                    ENTERED:

                                       Janet S. Baer
                                       United States Bankruptcy Judge

14